## THE STATE v. THOMAS OLIVER.

Dying declarations when admissible in evidence, constitute a well-known exception in more respects than one, to the fundamental principle which prevails generally, for they are admitted without the sanction and obligation of an oath, as well as in apparent derogation of the provision of the constitution which guarantees to the accused the right to meet and confront the witnesses against him face to face on the trial of the case. And are admissible when made under a solemn apprehension of impending and speedy death, although the deceased survived the mortal wound until twenty-five days afterward.

Murder in the first and second degree and manslaughter defined with reference to the case. If a party in resisting an officer and his posse in making a lawful arrest in a lawful manner, and in so doing, kills one of them with express malice, it is murder in the first degree ; but if the arrest is without lawful authority and the resistance is only in proportion to the assault and is provoked by it on their part, and the killing is without malice, it is murder in neither degree, nor manslaughter. He who resists an officer after he has made known his authority, does it at his peril, though the circumstances of such resistance and the means he had of knowing his authority, and the propriety of his mode of executing it, are fit to be considered on the question of malice.

On complaint of a breach of the peace a Justice of the Peace has authority to depute a person not a constable to act as such, and to issue a warrant thereon to him for the arrest of the defendant; and he is the sole judge of the exigency and necessity for such an appointment ; and if in executing in a lawful way the lawful authority so delegated to him, a person assisting him in making such arrest, is resisted and killed by the defendant in such unlawful resistance, it is murder, but of what degree must be determined as before stated, by the existence or not, of express malice aforethought. But if the writ does not justify the arrest, or the officer proceeds irregularly, the law gives him no protection in such excess, and if he, or any one assisting him is killed, the offence will be no more than manslaughter in the person whose liberty is thus invaded.

An officer with a warrant to arrest a party for a crime or misdemeanor, may not break into a house until he has demanded admittance and been refused ; nor attack the house or the party within it with violence, until he has been resisted and obliged to resort to violence ; nor fire upon the house, or the party, until he has been so fiercely resisted and opposed as to make that kind of force prudent and necessary. So on the other hand if he proceeds without lawful authority to arrest the party in his own house, the latter is not bound to yield, but may resist force with force ; he is not, however, authorized to go beyond the line of resistance proportioned to

the character of the force employed against him, or he in his turn be-
comes a wrong-doer.    And in either case, if death ensues from the abuse
of the power to arrest, or of the right to resist, it will be an unlawful
killing ; but unless there is malice, it will not be murder, it will be man-
slaughter only.

Peace officers having legal warrants to arrest for a breach of the peace, may
break open doors after due notice and demand of admittance, for in such
case the party's own house is no sanctuary for him.

Although a warrant is extremely defective in form, if it in substance com-
mands an arrest to hold to surety of the peace, which is within the
magistrate's jurisdiction and is such a criminal proceeding as justifies the
appointment by him upon an emergency of a person not a constable, to
execute it as such, it will not be void for that reason.

OCTOBER Term 1855, Sussex County.   At a court of
Oyer and Terminer held at this term, Thomas Oliver, a
free negro, was indicted and tried for the murder in the
first degree, of David Burton.   A son of the prisoner
had been duly bound as an indentured servant to a
brother of the latter, and in his absence from home, the
prisoner went to his house and took his son away from
his service, and while on their way from his house, the
deceased met them on the public road, and learning from
the prisoner the object he had in view, interposed to pre-
vent it, took his son away from him and sent him back
to his brother's residence.   In the meanwhile, first an
altercation and then a collision ensued between them, in
relation to which the prisoner afterward alleged that the
deceased had struck him twice upon his head with a piece
of fence rail, and soon afterward during the same day
the deceased made a complaint before a Justice of the
Peace that the prisoner had drawn a dirk knife upon him
on the occasion and threatened to kill him, on which he
issued an informal precept or warrant to T. C. Barker,
termed a deputized constable in it, commanding him to
apprehend the prisoner and bring him forthwith before
him to give sufficient surety for his appearance at the
next term of the Court of General Sessions of the Peace
and Jail Delivery for the county, and in the meanwhile
to keep the peace and be of good behavior and to keep

the peace with all the people of the State, and particularly with the said David Burton.   But on Barker's coming up with the prisoner soon afterward and informing him that he had such a writ to take him before the officer, he produced it and commenced reading it to him, when the latter turned and started toward his home before it was read through, saying at the same time that he would not be taken by him, or any body else, but then added he would not be taken by any body but the sheriff.   Barker then proceeded to call several persons, and among them, the deceased, to assist him in arresting the prisoner, who followed him to his house, which he entered before he was overtaken by them, and seizing a gun, pointed and leveled it out of the door at the party then thirty yards distant from him, and threatened to shoot them if they came any further, and defied them to advance any nearer toward him, and addressing the deceased in particular said, "Dave Burton, you are the one I want, and if you come any nearer, I'll have you, I will blow you through." The party being without weapons then withdrew to arm themselves, and Barker and the deceased and one other of the party provided themselves with shot guns, and with the party returned toward his house to renew the effort to arrest him ; but on approaching it, the former when forty yards from it, discharged his in the air and over it, to apprise the prisoner that the party was also now armed and with the view simply of intimidating him.   The house was then closed and fastened and the prisoner was nowhere visible within or about it.   The deceased with the other person armed then proceeded, the latter in advance, toward the house which had a second story with two windows in it, the constable and the rest of the party halting some distance from it.   The latter had reached a position from which he was watching the window in the west end of the second story and the door of the lower story on the south side of the house, while the deceased was on the other side of it and had just passed in front of it, when there was a gun snapped,

or a cap exploded from the direction of it, and the deceased exclaimed " here he is " and instantly discharged his gun up at the other window in the second story, the former immediately afterward observed the prisoner at the upper window on the other side and also discharged his gun at him, but without effect. The deceased was now passing again by the house in front and seeing that the prisoner-had his gun pointed directly and deliberately at him from the window above, was seeking to reach a position in the line of a tree near by to shun the effect of his aim, when he was deliberately shot by him, inflicting a mortal wound in his side, of which he died in twenty-six days afterward.

The attending physician testified that he was at once called to visit the deceased and found an opening in the back part of his left arm where a bullet had entered and passed in a downward direction into his left side and entirely through his left lung, but which could not then be further traced. From the direction which it had taken, it must have been fired, if he was standing erect when he was hit by it, from an elevation above him. That night after he had been shot the deceased thought he was dying and expressed his belief to him that he would be dead before the morning.

*Fisher, Attorney General :* Doctor, during that time did he tell you anything about his having been shot, the manner in which it was done, and by whom he was shot ?

*W. Saulsbury,* for the prisoner, objected to the question and the answer to be elicited by it, first, because under the provision of the constitution of the State the accused had a right to be confronted by every witness who could testify against him and to meet him face to face upon his trial, and secondly, because any statements then made by the deceased were not dying declarations, as he was not then dying, but survived his wound until twenty-five days thereafter.

*Fisher:* Enough had been stated to show that they were made under a solemn conviction that his death was impending and was then inevitable, and that was sufficient to make them admissible, notwithstanding he survived until twenty-five days afterward; and the admission of such evidence had never been considered to be in contravention of the provision of the constitution referred to. *Anthony v. The State*, 1 *Meigs* 265. *Woodside v. The State*, 2 *How. Miss. Rep.* 655. 1 *Greenl. Ev.* 205. 2 *Russ. on Crimes* 754. *Ros. Cr. Ev.* 33. 1 *Greenl. Ev. secs.* 156, 158.

*By the Court:* The provision of the constitution referred to, was not designed and was never understood to exclude such dying declarations as were admissible, and which were admissible even in our own courts long before any constitution was framed and adopted in the State, and have been ever since; and when admissible they constitute a well known exception to the fundamental principle of evidence in more respects than the one referred to, for they are admitted without the obligation or the sanction of an oath by the person making them, as well as in apparent derogation of the provision of the constitution. But they have a sanction when entitled to be admitted in evidence which the law regards as equivalent to the obligation of an oath, and that is the credit and solemnity with which the near and inevitable approach of death in the conviction of the person making them is believed and known to invest them, and that no one is inclined to utter anything but the truth at such an hour and under such a grave and solemn impression. They are also in part admitted from necessity, and the party who by his own act has put it out of the power of his victim to appear in evidence against him, cannot justly complain, if the law and the necessity of the case constrains the admission of his dying declarations without the sanction of an oath, or his appearance in person as a witness against him. On the other point, however, the court desires to hear further proof from the witness as

to the apprehensions and convictions of the deceased as to his condition and hope of recovery at the time the declarations were made by him, before deciding that branch of the question presented by the objection of the counsel for the prisoner.

The witness resumed his statement and added that when he entered the room in which he was lying, his first remark was to inquire how he was, to which his reply was "bad! bad! I am done for!" On moving him, there was a rush of air from his wound. The witness spoke of it, and he also observed it and spoke of it and expressed the opinion that the wound was fatal, and after the witness had expressed a hope to the contrary and that he would recover, he replied that he would die before the morning, and seemed firmly and solemnly convinced that he must die speedily and before morning; and the witness's own impression then was that he was dying, and would be dead before the morning.

*The Court*, upon this additional testimony, held that the declarations at that time made by the deceased under a firm and fixed conviction in his mind that death was immediately impending over him, were what are called and considered in law dying declarations, and as such were admissible in evidence.

The witness then said that the deceased told him that the first he saw of Tom Oliver after they went down to his house the second time to arrest him, he was at the window up stairs and that he levelled a gun at him and snapped it and bursted a cap in so doing, and if the gun had then gone off, he thought it would have killed him on the spot. He then discharged his own gun at him at the window, but Tom jumped back just as he pulled the trigger and the cap bursted. The next place he saw him was at the other window up stairs with his gun levelled at him. He said as soon as he had fired his own gun he passed around the house when he saw him at the west window with his gun levelled at him, and he then saw

that if he could not get to a willow tree in the yard and between the window and the road, he must be shot, and he was moving across the road to reach the tree, looking up the barrel of Tom's gun when he fired and shot him in the arm and side.

*Fisher, Attorney General,* contended that the evidence was positive and complete that the prisoner was actuated in the transactions of the whole day and from the beginning to the close of the fatal tragedy, by the most malignant and deliberate malice against the deceased in particular, and that there could not be a doubt that the killing of him under all the circumstances detailed, was murder committed with express malice and in the first degree under the statute.

*W. Saulsbnry,* for the prisoner : The killing was neither murder in the first, nor in the second degree, nor even manslaughter, because Benjamin Burton, the brother of the deceased, had no right to the son of the prisoner under the indenture of servitude proved in the case, and if he had, then his brother David Burton, had no right to seize him and take him from his father, the prisoner, without express authority from his brother as his agent for that purpose, which had not been shown. That Barker, the deputed constable, and the posse whom he summoned or called to his assistance to arrest the prisoner, even if the precept or warrant which was issued to him by the justice of the peace for that purpose, had been a legal writ and in due form of law, were not and could not be justified in proceeding to arrest the prisoner in the unlawful and violent manner pursued by them, to fire guns at and into his house, or even to break open an outer door of it on any such complaint, as up to that time had been made against him. By pursuing such a course, they became wrong-doers and tortfeasors themselves in such unwarrantable acts, and therefore it could not be, and would not have been, murder with express malice, or in

the first degree under the statute, if the prisoner had shot and killed any one or all of them, in resisting such attacks under such circumstances in defence of his property or his life. 1 *Russ. on Crimes* 482. To prove express malice by evidence of former grudges or antecedent menaces and threats, it was not sufficient to show that they were engendered by, or uttered during the altercation or conflict which resulted in the killing alleged in the indictment, but they must be shown to have existed prior to that, or to have been before entertained or expressed in cooler and less excited moments, than on the occurrence of the homicide alleged. Express malice must be clearly proved by the State, but the evidence of it had unquestionably failed under the facts and circumstances proved, and therefore it could not be murder in the first degree. It had also failed for the same reasons, to show to the satisfaction of the court and jury implied malice, malice implied by law as it is termed, which is defined to be the cruel act of killing a human being, however suddenly, without any or a considerable provocation. 1 *Russ. on Crimes* 482. But the constable's posse proceeded in a very improper manner against the prisoner, after it had withdrawn and equipped itself for the purpose, and proclaimed war against him before it reached his house by firing a gun in the direction of it, and by the armed investment of it by the deceased and another of the party, who immediately surrounded it with the intention of shooting the prisoner as soon as they saw him, and by each of them firing at him in rapid succession as soon as they discovered him at the windows, and that too, without even so much as demanding his surrender. What did all that armed array and hostile demonstration signify, if it did not indicate a determined purpose on their part to kill the prisoner on sight? And could he possibly have understood it in any other light? And after his house had first been fired on as he doubtless understood it, and he had himself twice been deliberately fired at from beneath his windows, he discharged in return the

fatal shot which killed David Burton, could it be said under such a maddening and perilous assault as that was, that it was done on his part without any or a considerable provocation ? Or could a greater provocation than that possibly be presented for the consideration of any court and jury ? Such a provocation and a sudden killing in consequence of it under such circumstances and in defence of his own person and life, not only absolutely negatived and disproved implied malice, but malice of any kind whatever in contemplation of law, and therefore it could not be murder with implied malice, or in the second degree under the statute, nor even manslaughter, because such a provocation would excuse the killing altogether under such circumstances, and therefore it could not constitute even that offense. He also contended and asked the court to charge the jury that Barker who was not a constable, but was only specially appointed or deputed by the justice of the peace for the purpose as such of arresting the prisoner, had no legal or rightful authority under such an appointment and in such a case to make any arrest whatever, and that consequently any attempt of his to arrest him was without any warrant or authority in law and rendered him and all associated with him, from the beginning and throughout the whole proceeding, trespassers and wrongdoers or tortfeasors toward the prisoner on that occasion. The power of a justice of the peace to depute a private citizen to act as a constable, was a special and limited power under the statute which conferred it, and could only be exercised when the offense complained of and alleged before him, amounted to some actual crime or misdemeanor in law, and could not extend or apply to a mere complaint of threats made and a proceeding to bind the party for his appearance at court and in the meanwhile to keep the peace, which was only a *quasi*, and not really in law or fact, a criminal proceeding under the statute. To invest all officers and ministers of justice in the performance of their official duties and powers in ar-

75

resting criminal offenders with that panoply and pro-
tection with which the law wisely arms and equips them,
the first essential requisite was that the arrest should be
legal and within the due scope of their lawful and official
authority, and a proper degree of prudence, caution and
forbearance well defined in the books, should be observed
in making it, without a resort to force and violence, and
peaceably if practicable. 1 *Russ. on Crimes*, 544, 666.
There must also be a legal officer to execute and a legal
process to authorize or warrant it. *Ibd.* 614, 618.  Even
in an arrest for an actual misdemeanor merely, a dwelling
house cannot be broken open ; much less may it be as-
sailed with fire arms discharged into its windows. *Ibd.* 54.
The officer must also give due notice to the offender of
his business and authority and demand submission to it,
before he can resort to extreme measures to enforce it.
*Ibd.* 622. 626. In a case of felony he may break open an
outer door of a dwelling house for the purpose, but then
only after announcing his business, character and author-
ity and after due notice of that, demands entrance and
submission to it. 1 *Ch. Crim. Law* 22. If, therefore, in the
simple attempt to illegally arrest the prisoner, he had in
resisting such an illegal arrest killed any of the party, it
would not have been murder in either degree, but man-
slaughter only. *Ibd.* 23. But if in such an illegal attempt
to arrest him, the posse proceeded at once, without any
such notice or demand, to fire upon his dwelling house
and into its windows at him, the extreme violence and
hazard of such an unlawful assault on their part, would
have clearly justified him in returning the fire upon any
one of them, in his own defence, and it would have con-
stituted such a great and outrageous provocation on their
part, that if under such circumstances he had killed any
one of them, it would not have been manslaughter even,
but a case of excusable homicide merely. 1 *Russ. on
Crimes* 660.

*E. D. Cullen,* for the State : The justice of the peace

was the sole judge of the emergency which required the appointment of a deputy constable to arrest the prisoner, and his action in the premises was final and conclusive and could not be called in question elsewhere. *Ros. Crim. Ev.* 756, 763. But admitting, which he did not, that there was any irregularity or invalidity in the indenture of servitude of the son of the prisoner to the brother of the deceased, it could not justify or excuse his act in taking him from such service in the manner proved, because the statute provides and prescribes the proper and only remedy and recourse which such an indentured servant has in such a case. Nor could the altercation and collision which occurred between the prisoner and the deceased when they encountered each other on the public road that morning, over the boy, justify or excuse in the slightest degree, the shooting and killing of the latter by the former in the afternoon of that day, when he was aiding and assisting an officer of the law in his duty and efforts to arrest him on a valid warrant issued by a competent officer commanding his arrest on such a complaint duly preferred against him. In such a case of misdemeanor or breach of the peace, an officer with a valid warrant may force an entrance into a dwelling house to make an arrest, even when he meets with no armed resistance or hostile defiance on the part of the accused. *Ibd.* 757, 759. And the same powers which the officer possesses in such a case, are also possessed by their aids and assistants for the time being. *Archb. Crim. Pl.* 29.

But the counsel for the prisoner in his extreme and extravagant effort to excuse and exculpate him from any criminal offense whatever, had even attempted to present his case before the court and jury, as a much injured and entirely innocent and harmless man, who had not only been unjustly and unlawfully, but most wantonly and outrageously assailed by but a little better than an armed and lawless mob of tortfeasors and wrong-doers, as he termed them, resolutely bent from the start on nothing short of taking his life, but in doing so, he had found it

very convenient and expedient for his purpose, to entirely overlook and ignore most of the material facts proved in the case, and with them the important fact that hours after his first encounter with the deceased in the morning of that day, and after he had had ample and abundant time and opportunity to cool, and had in fact recovered from the passion and excitement produced by it, and when he was in fact perfectly collected and composed in his temper after it, how calmly and even insolently he declined and refused to hear the warrant for his arrest read to him by Barker, the officer charged with it, and deliberately turning upon his heel told him he would not be taken by him, or any body else but the sheriff, and slowly and sullenly walked off to his house and at once proceeded to arm himself to resist it at all hazards and to the last extremity, even to the risk of his own life upon the gallows. Also the important fact pregnant with venom and malice express of the most malignant and vindictive character, that when that officer and his posse first approached his house peaceably and quietly without any gun or weapon whatever for the purpose of arresting him in a perfectly lawful and unexceptionable manner, it was this defiant criminal and murderer who was the first to appeal to arms, to proclaim war and to present a loaded gun at them from his open door, to boldly and insolently forbid them to come within thirty yards of it, and to impudently defy them to approach any nearer at the peril of their lives, and singling out the deceased in particular from the rest of the party, to deliberately say to him in the words of that ominous and malicious threat which shows that even then the heart of the prisoner was thirsting for his blood, " Dave Burton, you are the one I want! come any nearer and I will have you, I will blow you through! " The counsel had also utterly ignored the further important fact proved, that the constable and his posse had thus been successfully resisted in their first attempt to arrest him , and were necessarily obliged to retire, in order to prepare for the emergency,and the strife

which the prisoner had thus been the first to provoke and inaugurate, but when they afterward returned again to some extent better provided and prepared for it, that although the previous insolence and audacity, as well as the hardihood and desperation of the prisoner had in some degree deserted him, as soon as he discovered that he was not the only party armed for the occasion, that he at once made prudent and considerate haste to close his doors and fasten up his house, and with due premeditation and precaution to take refuge with his ever ready gun in the second story of it, and yet it was clearly manifest from all the testimony on that point, that he was only skulking there like a coward, and stealing, like a murderer intent upon preserving his own life, furtively from window to window for the sole purpose of glutting his revenge in the blood of " Dave Burton," as he called him, and as soon as the coveted opportunity presented itself of shooting him, and no body else.  For as soon as he had accomplished that, his sole object, he made no further effort to defend either his property, his person, or his life, as the counsel for the prisoner he presumed would be pleased to consider and call this gallant defence on his part, but incontinently sneaked away and hid himself in a secret and obscure portion of it, until his house was afterward broken open and ransacked by the posse and he was found in his hiding place and dragged forth like a fox or a wolf dug out of his den, without even so much as afterward raising his finger against any other man.  All this and even more had been very conveniently blinked, overlooked and ignored by the learned counsel in the extremely mild and excusable, if not commendable, aspect in which he had been pleased to present and vindicate this case on behalf of the prisoner; and he must say that with all this carefully excluded from his view in the progress and development of such a deliberate, premeditated and cold-blooded murder as this had clearly been proved to be, it was easy for him perhaps, to come to the extraordinary conclusion announced by him, that it was not murder in either de_

gree under the statute, nor even manslaughter, but that it was a clear case of excusable, or justifiable homicide in self-defence, or in other words, that it was in contemplation of law, no crime at all.

Much too had been said by the counsel as to the mode in which the constable and his posse should have proceeded in the execution of the warrant issued by the justice of the peace for the arrest of the prisoner, and one of the exceptions taken to it, was that when they reached his house the second time, it then being in the dusk of the evening, and when they unexpectedly found it entirely closed and locked up and apparently deserted by him, they did not produce and read the process to him, or announce the purport of it to him, or otherwise give him some notice or warning of the object of their visit, or formally summon him to surrender to its command and authority. But it would be remembered by the jury that at the very inception of the effort to arrest him, he had been duly apprised by the constable of the tenor of the warrant, saw it in his hands, but spurning and contemning it from the outset he refused to hear it read, and when that insolent reply was made by him which he had just before repeated, and thereupon instantly repaired to his house and prepared himself with his gun to resist him and everybody else but the sheriff. It would also be remembered that afterward when the constable had summoned his posse and proceeded to within thirty or forty yards of his house for that purpose, but without any arms to enforce the execution of it, how the prisoner confronted them in his open door with his gun in his hands pointed at them, and without a word from any one of them, or asking himself a single question, for he well knew their business and the object of their coming, he immediately forbade them to approach one step nearer, and addressing himself to the deceased, uttered that ominous and portentous threat which he had also just before repeated. Not one of that lawless and warlike band, to use the language of the counsel, it would likewise be remembered,

was then armed with a solitary weapon of any kind whatever. They accordingly withdrew, for they had now fully learnt the desperate character of the reckless and law-defying criminal they had to deal with, and what was imperatively needed in order to maintain the majesty and supremacy of the law and to perform their duty in such an emergency. In the interval which next elapsed before their return and second visit to his premises for the purpose of arresting him, the prisoner again had ample time, not only for calm and cool reflection upon all he had as yet done, and to dispassionately consider all the probable consequences both to himself and others, if he still persisted in the violent and outrageous course which he was then pursuing, but also to prepare and put his house in complete order for the impending crisis which was now speedily approaching in the bloody tragedy which he had deliberately resolved to provoke and bring about, with the evident design, hope and expectation all the while, that he would yet be able to terminate it in that very catastrophe in which it finally and soon afterward so unfortunately resulted. This he did by carefully closing and locking all the doors, extinguishing all the lights and by stealthily betaking himself with his bullet-loaded gun to the more congenial gloom, security and seclusion of the upper story, where unseen and unsuspected he could patiently abide the return of the constable and his party, secretly and silently watch their coming and every movement as they approached, and from a loop-hole, as it were in the wall, safely shoot and kill David Burton at the first fire and on the first opportunity. That formidable band of assailants, it should also be remembered, had but three small fowling pieces, charged not with bullets, but with bird-shot merely, one of which it seemed was discharged into the air by the gallant constable himself while yet forty yards from the house, for the simple purpose of apprising Tom, that some body else now had a gun, as well as he, and that he might thereupon take due warning and give up the citadel and surrender without any further re-

sistance. The constable and all his party halted and took up a position of observation about that distance from the house, with the exception of the deceased and another of the posse, who quietly advanced up to it, but who were surprised to find it securely locked and apparently entirely deserted. It was in total darkness, and no one could be seen or heard in it, or about it, and their impression and conclusion therefore very naturally was that Tom in the meanwhile had thought better of the matter, and had concluded to leave it for parts unknown, little suspecting that at that very moment he was lying concealed in ambush up stairs and intently watching the movement of each of them as they approached the house. They concluded, however, to take a silent survey of the outside of it, by each quietly walking around it in opposite directions, when a gun was suddenly snapped and a cap exploded by Tom from one of the upper windows at the deceased, who immediately exclaimed " here he is ! " and in turn discharged his gun at him, but without effect. Tom instantly appeared at another window up stairs, when he was shot at by the other member of the posse, but was again missed. He now knew that the guns below were all empty, and taking deliberate aim a second time from a window above at the deceased, he fired the fatal shot which resulted in his death. And after thus recapitulating the evidence on that point, all he had to say in reply to the objection on the other side before referred to, was that even if the prisoner had not had previous to that time, full and ample notice of the warrant for his arrest in the hands of the constable and his posse, that there was no time then in such a sudden and momentous emergency produced by his own act and by his own violent and lawless resistance, to read the warrant to him, to notify him of the purport of it, or even to summon him to an instant surrender. For such a sudden, unexpected and insidious and deadly assault made upon a member of the posse, at once put each and every one on the instant defence of their own lives, and justified any

of them in shooting him dead upon the spot without a wink or a word before the act. And he had no doubt the court would substantially so inform the jury when it came to charge them upon the facts proved and to instruct them in regard to the law of the case. Much had also been said by the learned counsel in strong and vehement denunciation of the conduct of the constable in particular on the occasion, that verdant, improvised and unsophisticated officer who, in the simplicity of his heart, was green enough to imagine that by firing a load of birdshot forty yards off over Tom's house, would strike such terror into his soul that he would instantly surrender, and thereby prevent any further trouble or waste of gunpowder on that trying and solemn occasion. But the intent and object of that idle and foolish act on his part had been well explained in the testimony of the witnesses and required scarcely a passing notice from him. It signally failed, however, of its designed and anticipated effect, for so far from its appalling or intimidating Tom, he had no doubt the report sent an instant thrill of pleasure to his vindictive heart, and he welcomed it with joy as the harbinger of their return at last and of their certain and speedy approach to the fatal pit and snare, which he now had in full readiness for his victim, David Burton, and where in the gathering and congenial gloom and the solitude of his hidden lair, he had been anxiously and impatiently awaiting his long last coming for several hours. So far then as that trivial circumstance, on which so much stress had been laid by the counsel on the other side, was connected with the aspect and bearings of the case, when viewed and considered in its proper light and effect, it constituted a great aggravation, instead of any palliation, alleviation or extenuation of the deliberate deed and premeditated crime committed by the prisoner.

He had now, he thought, substantially answered all of the argument of the counsel on the other side and presented all the evidence in the case in its true and proper

76

aspect, and upon the evidence as thus set forth, he should confidently submit the question and leave it for the decision of the court whether it did not constitute such a case of antecedent threats and menaces to kill the deceased, uttered twice during the day, and after ample time for calm and sober reflection, and such a deliberate mind and formed design after hours of deliberation and premeditation upon the matter, as to render and constitute it in contemplation of law, more than an ordinary, even a strong and aggravated case of murder with express malice aforethought, and of course, in the first degree under the statute.

*The Court, Harrington, C. J.*, charged the jury: The prisoner at the bar, Thomas Oliver, is charged with murder in the first degree under the statute in shooting and killing David Burton on the 30th of May last. It is your unpleasant but necessary duty to ascertain whether he is guilty, and if so, to what extent he is guilty, and what ought to be the measure of his punishment, for under the statute he may, upon this indictment, be convicted of murder in the first, or in the second degree, or of manslaughter, or acquitted, according as the evidence in the case may warrant the jury in finding such a verdict. It is a grave and responsible duty to be discharged with calmness and caution and with a careful application of the testimony, and with a due sense of responsibility to the public and the prisoner, recognizing the high obligations resting upon you as citizens without forgetting that which belongs to you as christian men having to decide the question of life or death for a fellow being. Those obligations rest upon us without any reference to the cast, or color or condition of the accused.

If Thomas Oliver slew David Burton with express malice aforethought he is to be deemed guilty of murder in the first degree and felony, and shall suffer death; if he slew David Burton without express malice aforethought, but still with what is termed legal malice, or

malice implied by law, he will be deemed guilty of murder in the second degree and of felony, and will be punished with pillory, whipping and sale into slavery for life; if he slew him in the heat of blood upon sufficient provocation, without malice, he will be deemed guilty of manslaughter, and will receive the punishment which the law assigns to that grade of crime.    In either case it is the evidence which fixes the grade, and the law the punishment, without any reference to the individual case.    What is murder in one case, is murder under the same conditions in all cases and by all persons, and if the circumstance of express malice aforethought be wanting in any case of homicide, the grade of criminality in such case, can never rise to murder in the first degree.

The first point of inquiry therefore in the case is whether the slaying of David Burton (if you find that he was slain by the prisoner) was done with express malice aforethought, and without any legal justification, extenuation, or excuse.    Express malice is hatred or ill-will manifested by threats or contrivances to do the party bodily harm and by preconceived plans and devices to execute a deadly purpose in the gratification of such malice.    It is not merely the doing an unlawful act of violence, but the doing it designedly and of preconceived purpose at the prompting of hatred and revenge.    Implied malice is where the act is still unlawful, done without justification or excuse, but done without such hatred or revenge.    Malice can only be proved from the declarations, admissions or overt acts of the offender.    If it be proved from the acts or words of the prisoner that previously to the homicide he entertained malice and ill-will toward the deceased, and if the jury be of the opinion that the malice still existed at the time of the homicide, and was wholly or partly the prisoner's motive for committing it, no circumstance of extenuation or excuse, which in the absence of such proof of express malice, would have reduced the offence to manslaughter, or shown it to be excusable homicide merely, will warrant the jury

in finding otherwise than that the prisoner is guilty of murder. 2 *Archb. Cr. Pl.* 213, 215. *Fost.* 277, 132.

When a party resists an officer, or those engaged in assisting him in making a lawful arrest in a lawful way, if he slay one of the arresting party in this unlawful defence or resistance, it is murder, and if done with express malice aforethought, murder in the first degree. But if the arrest be without lawful authority, and the resistance is only such as is provoked by, and in due proportion to the assault, and the killing was without malice, it would not be murder of any grade, or even manslaughter. It is important therefore for us to know whether Thomas P. Barker and the persons who were acting with him on this occasion, had lawful authority to arrest the prisoner, and were lawfully executing that authority. The prisoner denied the authority at the time, and objected to being taken by any one but the sheriff. His mistake on this subject can have no tendency to excuse him for an unlawful resistance to an officer duly authorized to arrest him, and who had made that authority known to him; but it may well be considered by you in ascertaining whether the prisoner was acting through malice toward the deceased, or in the unlawful defence of his house or person. Such a defence subjects the party to all the legal consequences of resisting lawful authority. He who undertakes to resist an officer after he has made known his authority, does so at his peril, if it turns out that the authority of such officer or person was valid. Though the circumstances of such resistance, and the means of knowing the person's authority, and the propriety of the mode of executing that authority, are fit to be considered on the question of malice.

On the day of this fatal affair, Thomas P. Barker was deputed by Justice Benjamin D. Burton to arrest the prisoner on a complaint of the deceased and to bring him before him that he might be held to security of the peace. The prisoner resisted that officer and denied his authority, and his counsel in this case has denied the authority, and

has made the point before the Court that for the purpose
of arresting a person not charged with an indictable
crime or offence, a Justice of the Peace has not the power
to deputize a person who is not a constable, to act as a
constable. Upon an examination of the law in reference
to this question, the court differ with the prisoner's coun-
sel, and are of opinion that the Justice had the power,
in an emergency, of which he was the sole and exclusive
judge, to delegate authority to any person for this purpose,
and that Thomas P. Barker had a right to arrest the
prisoner, using therefor only legal and proper means.
Resistance was therefore unlawful, if Barker was exer-
cising this lawful authority in a lawful way; and if David
Burton, acting in aid of the deputy constable, was killed
by the prisoner in such unlawful resistance, it is murder,
but of what degree of murder must be determined as be-
fore stated, by the existence, or not, of express malice
aforethought. The principle is this that if an officer
having a lawful writ for the arrest of a person on the
charge of a crime, or indictable misdemeanor, is resisted
after proper notice of his authority and purpose, and in
the course of that resistance is slain, the defendant is
guilty of murder, that is, of murder at the common law
with implied malice, and murder under our act of As-
sembly of such degree as the presence or absence of
express malice classes it. But if the writ does not justify
the arrest, or the officer proceeds irregularly, " the law
gives him no protection in that excess, and if he be killed,
the offence will amount to no more than manslaughter in
the person whose liberty is invaded." 1 *Russ. on Crimes*
627. *Fost.* 312. The possession of lawful authority by the
party attempting the arrest gives a character to his acts,
and to those of the party resisting, which with due pre-
caution protects the one, and involves the other in the
consequences of unlawful resistance. But this does not
cover every mode of action on the part of either. A law-
ful power to arrest may be exercised in such a wanton
and unlawful manner as to make the officer a trespasser

and justify resistance, and a lawful resistance may be made with such fierceness as to make the repellant an assailant in his turn and a wrong-doer. Thus if an officer having a warrant to arrest a man for a crime or misdemeanor, finds him at his house, he may not break into the house until he has demanded admittance and been refused; he may not attack the house or the person within with violence, until he has been resisted and thus obliged to resort to violence, he may not fire upon the house or the person within it, until he has been so fiercely resisted and opposed as to make that kind of attack prudent and necessary; and if he does proceed to execute even lawful authority in this unlawful way, he justifies resistance. So on the other hand, if an officer comes without lawful authority to arrest a man in his own house, the party is not bound to yield and may resist force with force, but he is not authorized to go beyond the line of resistance proportioned to the character of the assault, or he in his turn, becomes a wrong-doer. And in either case if death ensues from the abuse of the power to arrest, or the right to resist, it will be an unlawful killing; but unless there is malice, it will not be murder, it will be manslaughter only.

From these principles the jury will perceive the importance of the question whether Barker and those with him had a right to arrest the prisoner in the manner in which it was attempted, and whether he had a right to resist such a mode of arrest; but the solution of these questions does not necessarily determine the guilt of the homicide. If Barker had a right to so make the arrest, he might make himself a trespasser by undue violence; and if Oliver had a right to resist, he could also become a wrong-doer by undue violence. On the right of an officer to arrest a party against whom he has a peace warrant merely, the authorities cited were supposed to be conflicting, but there is in fact, no conflict upon the material point in question. Peace officers having legal warrants to arrest for a breach of the peace, may break open

doors after due notice and demand of admittance, but not in the execution of civil process. In criminal cases where a felony has been committed, or a dangerous wound has been inflicted, or even where an officer of justice comes armed with process founded on a breach of the peace, the party's own house is no sanctuary for him. Doors in any of these cases may be forced; but without such warrant, or where the officer comes to execute civil process, he cannot lawfully violate the sanctity of a man's dwelling to arrest him, or to serve process. 1 *Hawk.* 130, *chap.* 31, *secs.* 57, 58. 2 *Archb.* 242, 243 *n.* 1, 144. The form of the warrant in this case is exceedingly defective, so much so, as to have produced a doubt whether the substance of any charge could be collected from it justifying any arrest whatever. It recites no complaint, no affidavit, no charge, but commands Thomas P. Barker, " a deputized constable " to apprehend Thomas Oliver and bring him forthwith before the Justice to find sureties for his appearance at Court, and to keep the peace and be of good behavior toward all the people of the State and more especially toward David Burton. The warrant gives authority to arrest the prisoner and bring him before the Justice to enter into security to keep the peace; and not for any hearing upon any charge whatever. But the general provision of our criminal code, is that when substantially right, process shall not be invalid for any defect of form, and this process does in substance, command an arrest to hold to surety of the peace which is within the magistrate's jurisdiction, and is such a criminal proceeding as justifies the appointment, on an emergency, of a person to act as a special constable. In the lawful execution of this process the deputized officer had a right to use the force necessary for that purpose and to resist force by force, so long as any resistance on the part of the prisoner was unlawful; but if he exceeded his authority and justified resistance on the part of the prisoner, it would reduce the criminality of a homicide resulting from such resistance. The prisoner refused to

be arrested, retired to his house, denying the power of the person who was for that occasion only an officer, to arrest him, but offering to submit to the sheriff, and armed himself for resistance. This arming himself to resist an arrest authorized Barker and his party to arm themselves, but not to use these arms without actual resistance. Approaching the prisoner's house, it is in evidence that Barker first fired a gun, whether at the prisoner, or at his house, or merely for the purpose of intimidating him, is not clear, but it was after the prisoner had been told by Edward Burton who was not one of the arresting party, that they would take him if they had to kill him, or burn his house. After the prisoner had retreated to his house and closed the door, the arresting party had no legal right under this warrant to break open the doors, to fire into the windows, or at the house, before the prisoner had fired from the house or levelled and snapped his gun at one of the arresting party, and such mode of attack justified resistance on the part of the prisoner in a lawful and proper manner. Such shooting at him in his own house by an officer who held only a warrant to arrest him to hold him to surety of the peace would be decidedly unlawful. Even in cases of felony, the officer arresting would not be authorized to proceed to such extremities before actual and dangerous resistance of his authority; and on a mere peace warrant the person executing it would have no right to break into the defendant's house, much less to fire into it, or shoot the accused, to effect his arrest. Under this view of the case the resistance of the prisoner to an unlawful attack, though such resistance should result in the death of the aggressor, could not amount to murder, but manslaughter only, or homicide in self-defence. The law of self-defence justifies the repelling of force by force in such cases, even unto death, but gives no protection to wanton or unnecessary aggression.

The beginning of the difficulties which led on that day to the unfortunate result of David Burton's death seems

to have been in the morning, as testified to by Joseph R. Barker. The prisoner was passing along the road in company with his son, who, it seems, had been bound to Benjamin Burton Esquire. David Burton overtook them and claimed the return of the boy, which the prisoner refused, and thereupon a collision ensued between them. Burton struck him with a piece of fence rail and he struck at Burton with a dirk knife, spear or some other weapon. The deceased fled for the moment, but the violence on both sides seemed soon to have calmed down, as shortly afterward we find them walking together along the road without any appearance of hostility to each other. This was about nine o'clock in the morning. The validity of Benjamin Burton's claim to the boy does not come in question in the case now before the court and jury, as the legality of the indentures cannot thus be incidentally or collaterally enquired into, but if it could, we would be bound to recognize it, though the indenture is in some respects defective; but this would not give the deceased any power over the boy, unless he was proved to be the agent of the master. It seems, however, that the deceased got him away from the prisoner, and then proceeded to take out process for arresting him and holding him to surety of the peace, in the attempted execution of which this fatal result took place. Oliver retired to his house and armed and fortified himself and refused to be taken, threatening to fire on the assailants and particularly, the deceased, with whom he had had the affray that morning. The person having the peace warrant armed himself also, and those whom he called to his aid, and approached the house. A gun was fired first by him at the prisoner, at the house, or toward the house, (about which the evidence differs;) a gun was then snapped, exploding the cap, from the house; the deceased then fired at the prisoner, or the window where he was seen, another gun was also then fired by Mr. Stockley at another window where he saw the prisoner, and then the deceased was shot. Taking this chain of acts with all that is proved

77

to have been done or said by the prisoner and the de-
ceased, or others of the party, it will be for the jury to
say whether there was any justification, excuse or pallia-
tion for the homicide; and if not, whether there is satis-
factory evidence of express malice on the part of the
prisoner. If threats are relied on, (and threats are evi-
dence of malice) they must be taken in connection with
surrounding circumstances, whether they were made in
defiance of what was, or was supposed to be, an unlawful
assault, or as evidence of a deadly purpose unlawful in
itself, whether made after the affray began, or antecedent-
ly, and whether made calmly and with deliberation, or in
the heat of blood from recent provocation, or under the
excitement and intimidation of an approaching attack,
and more especially and finally, whether that attack was
justified in its force and violence by any authority which
the officer possessed, or by any previous force or violence
on the part of the prisoner. These are important ques-
tions for the jury to determine. If Barker had authority
to arrest the prisoner by attacking his house, or the use
of weapons was justified by the resistance made, the kill-
ing in such unlawful resistance would be murder, and if
malicious, murder in the first degree; if the prisoner
had the right to resist, either because Barker had no right
to assail his house, or assail it with unlawful violence, a
killing in the prudent and proper exercise of such right
of resistance, would be neither murder, nor manslaughter;
but if he having a right to resist, resisted with unlawful
fierceness, the killing would be manslaughter, or at most
murder in the second degree. The unlawful manner of
doing a lawful act can never without clear proof of ex-
press malice aforethought, amount to murder in the first
degree.

These are the legal principles which belong to this case.
You will apply the facts to them. I have stated only so
much of the evidence as was necessary to present the
legal questions which the facts raise and upon which the
Court is bound to instruct the jury. You are not to re-

gard any fact stated by me unless you recollect it was proved by the witnesses, and if I have made any reference to facts not precisely warranted by the proof you will correct me. And if upon the whole case there remains on your minds a reasonable doubt of the guilt of the prisoner, such a doubt growing out of the evidence, or founded on the want of complete evidence, as would sway the mind of a reasonable man and prevent his judgment from coming to a satisfactory conclusion of guilt, it is a principle of law and of humanity that the prisoner shall have the benefit of such doubt, and the decision on such doubtful point must be in his favor.

The jury, after considerable time spent in deliberation on the case, returned a verdict of guilty of murder in the second degree.